**Yolanda MARTINEZ, Petitioner,**

v.

**Jeanne C. LEWIS, as personal representative of the estate of Frederick A. Lewis, Jr., M.D., individually and d/b/a Frederick A. Lewis, M.D., P.C., Respondent.**

**No. 97SC81.**

Supreme Court of Colorado,
En Banc.

Dec. 14, 1998.

The Law Office of Danny R. Hemphill, Danny R. Hemphill, Boulder, Colorado, Law Offices of Thomas D. Roberts, Thomas D. Roberts, Asheville, North Carolina, Attorneys for Petitioner.

Kennedy & Christopher, P.C., Frank R. Kennedy, Ronald H. Nemirow, Denver, Colorado, Attorneys for Respondent.

Montgomery Little & McGrew, P.C., Patrick T. O'Rourke, David A. Burlage, Englewood, Colorado, Attorneys for Amicus Curiae Colorado Medical Society.

Campbell Latiolais & Ruebel, P.C., Colin C. Campbell, Denver, Colorado, Attorneys

for Amicus Curiae Colorado Defense Lawyers Association.

Davis Graham & Stubbs, LLP, Andrew M. Low, Brett C. Painter, Denver, Colorado, Attorneys for Amicus Curiae Physician Insurers Association of America

Richard W. Laugesen, Denver, Colorado, Attorney for Amicus Curiae Richard W. Laugesen.

Chief Justice MULLARKEY delivered the Opinion of the Court.

We granted certiorari to consider whether the court of appeals erred in *Martinez v. Lewis*, 942 P.2d 1219 (Colo.App.1995), when it affirmed an order by the Denver District Court (trial court) granting summary judgment against the petitioner, Yolanda Martinez (Martinez), and in favor of Frederick Lewis, Jr., M.D. (Dr. Lewis).[1]

Dr. Lewis conducted an independent medical evaluation (IME) of Martinez at the request of Martinez's insurer, State Farm Mutual Automobile Insurance Company (State Farm). The purpose of the IME was to evaluate the existence and extent of Martinez's claimed neurological injuries allegedly sustained when the car she was driving was rear-ended by an uninsured motorist. In a report to State Farm, Dr. Lewis concluded that Martinez was "malingering." State Farm subsequently denied Martinez coverage for future psychiatric or psychological care under her no-fault automobile insurance policy.

After State Farm denied coverage, Martinez brought suit against State Farm for violations of the Colorado Auto Accident Reparations Act, see §§ 10–4–701 to –725, 4A C.R.S. (1986 & 1992 Supp.), breach of contract, and breach of the duty of good faith and fair dealing. Approximately one year later, Martinez amended her complaint to include claims against Dr. Lewis for profes-

sional negligence, breach of fiduciary duty, and violation of section 6–1–105, 2 C.R.S. (1992 & 1994 Supp.), of the Colorado Consumer Protection Act (CCPA). Only the claims against Dr. Lewis are at issue here.

In affirming the trial court's summary judgment order, the court of appeals held that Dr. Lewis did not owe a duty of care to Martinez. *See Martinez,* 942 P.2d at 1221–24. Consequently, according to the court of appeals, Dr. Lewis was not liable to Martinez for his IME reports notwithstanding Martinez's assertions that the reports led to State Farm's erroneous denial of benefits. The court of appeals also held that Martinez was not entitled to relief under the CCPA. *See id.* at 1224–26.

We now affirm the judgment of the court of appeals. We hold that, under the facts of this case, Dr. Lewis did not owe a duty to Martinez. Additionally, we hold that Martinez could not seek damages under the CCPA for the alleged misrepresentations Dr. Lewis made to State Farm.

I.

The material facts relevant to Dr. Lewis's summary judgment motion are not in dispute. On September 3, 1991, Martinez was in an automobile collision in Pueblo, Colorado. Following the accident, Martinez received medical care for cognitive deficits she claimed resulted from a closed-head injury she sustained in the accident. Martinez made a claim for benefits with State Farm for the therapy she received. State Farm subsequently requested that Dr. Lewis perform an IME for purposes of evaluating the existence and extent of Martinez's claimed neurological injuries.

After meeting with Martinez on March 3, 1992, Dr. Lewis submitted to State Farm a completed report summarizing his evaluation of her condition. In his report, Dr. Lewis

---

1. We granted certiorari on the following issues:
   1. Whether the court of appeals erred in holding that a physician conducting a medical examination at the request of a first party insurer has no duty to avoid injuring the insured.
   2. Whether the court of appeals erred in finding that the social utility of independent medical examinations justifies granting physicians com-

plete and total immunity from liability for injuries caused by intentional use of substandard practices.
   3. Whether the court of appeals erred in holding that an insurance examinee is not within the group of persons that the Colorado Consumer Protection Act was designed to protect.

provided a synopsis of his examination of Martinez, information he obtained from Martinez, and the results of a battery of computerized psychometric tests. Dr. Lewis also described his review of the progress notes of other health care professionals who treated Martinez. Based on the foregoing, Dr. Lewis concluded in his report that "my impression is that the patient is malingering." After Dr. Lewis submitted his report, State Farm discontinued payment for any future psychiatric and psychological treatment.

Martinez then sued State Farm on September 24, 1993. In her complaint, Martinez alleged that State Farm willfully and wantonly failed to pay policy benefits within the time limits provided in section 10–4–708, 4A C.R.S. (1986 & 1992 Supp.), of the Colorado Auto Accident Reparations Act. Martinez also made a breach of contract claim and a claim for a breach of the duty of good faith and fair dealing.

At State Farm's request, Dr. Lewis performed a reevaluation of Martinez on March 14, 1994. In his reevaluation report, Dr. Lewis summarized his review of Martinez's medical records, the traffic accident report, Martinez's patient history, and the results from another battery of psychometric tests. In the conclusion of the report, Dr. Lewis stated, "My impression remains that the patient is malingering."

On September 23, 1994, Dr. Lewis submitted a supplemental report to State Farm concerning his prior evaluations. In the supplemental report, Dr. Lewis summarized information he received from State Farm's attorney concerning a psychological report made by one of Martinez's expert witnesses, who was also the clinical psychologist treating Martinez. After reviewing the clinical psychologist's report, Dr. Lewis concluded that "my overall impression continues to be that the patient is Malingering [sic] in the sense that she is not telling the truth."

On October 17, 1994, Martinez filed an amended complaint in which she added Dr. Lewis as a defendant.[2] In her amended complaint, Martinez made claims against Dr.

Lewis for negligence, breach of fiduciary duty, and violation of the CCPA. Martinez alleged that Dr. Lewis negligently evaluated and examined Martinez and was negligent in using computerized neuropsychological testing. Martinez also alleged that Dr. Lewis concealed the fact that he was not qualified to select, administer, and interpret computerized neuropsychological tests. As a result of Dr. Lewis's alleged negligence, Martinez asserted that she did not receive necessary treatment from March 1992 "until her injuries were correctly diagnosed by [another physician] on September 27, 1993."

Dr. Lewis subsequently moved for summary judgment. In response to the negligence claim, Dr. Lewis argued that, as a physician conducting an IME for State Farm, he did not owe a duty to Martinez as a matter of law. Regarding the CCPA claim, Dr. Lewis argued that it was undisputed that he did not make any representations to Martinez regarding any of the services he performed for State Farm.

In an order dated June 2, 1995, the trial court granted Dr. Lewis's summary judgment motion. Applying this court's discussion in *Greenberg v. Perkins*, 845 P.2d 530, 536–38 (Colo.1993), of the multiple factors that a court should consider in determining whether a defendant owes a duty of care to a plaintiff, the trial court concluded that Dr. Lewis did not owe Martinez a duty. The trial court explained:

> The absence of a physician-patient relationship, the fact that Dr. Lewis was not undertaking to treat Plaintiff and caused her no physical injury, and the need for physicians to be able to objectively assess insurance claims all support this conclusion, as does case law from other jurisdictions.

(Citations omitted.)

The trial court also ruled that Martinez failed to state a claim under the CCPA. As the trial court explained, Martinez stated in her deposition testimony that she did not recall Dr. Lewis making any representations

---

**2.** Dr. Lewis died during the pendency of Martinez's appeal to the court of appeals. *See Martinez*, 942 P.2d at 1221. Consequently, Dr. Lewis's estate and the estate's personal representative were substituted for Dr. Lewis.

to her concerning his background, qualifications, or services. Additionally, the trial court explained that Martinez did not rely on any alleged misrepresentations in seeing Dr. Lewis, as Dr. Lewis was the physician selected by State Farm to evaluate Martinez's claims for treatment.

On appeal, the court of appeals affirmed the trial court's ruling. *See Martinez*, 942 P.2d at 1221–26. The court of appeals held that Dr. Lewis did not owe Martinez a legally cognizable duty. *See id.* at 1224. In so holding, the court of appeals stated:

> Here, plaintiff contends that her injury resulted from denied and delayed treatment. She stated in her deposition that she was not physically injured while undergoing examinations by Lewis. Under these circumstances, since no doctor-patient relationship existed between plaintiff and Lewis, since she does not assert injury during the course of the examination, and since she did not rely on Lewis for treatment, care, or advice, we hold that Lewis is not liable to plaintiff for professional negligence. The doctor's duty to use reasonable care in making and preparing the report runs to the party requesting it; here, that was State Farm, not plaintiff.

*Id.* at 1223.

The court of appeals also held that Martinez was not within the class of persons whom the CCPA was intended to protect, and consequently, she did not have a viable claim against Dr. Lewis for violating the CCPA. *See id.* at 1226. As did the trial court, the court of appeals explained that Martinez had neither asserted that Dr. Lewis made misrepresentations to her, nor presented any evidence indicating that Dr. Lewis made any misrepresentations to the public. *See id.* Rather, the alleged misconduct occurred within the context of the contract

between State Farm and Dr. Lewis. *See id.* Consequently, the CCPA was not applicable.

## II. The Negligence Claim

In order to establish a prima facie case for negligence, a plaintiff must show a legal duty of care on the defendant's part, breach of that duty, injury to the plaintiff, and causation, i.e., that the defendant's breach caused the plaintiff's injury. *See Gerrity Oil & Gas Corp. v. Magness*, 946 P.2d 913, 929 (Colo.1997); *Connes v. Molalla Transp. Sys., Inc.*, 831 P.2d 1316, 1320 (Colo. 1992). Because a negligence claim will fail if it is based on circumstances for which the law imposes no duty of care upon the defendant, *see Connes*, 831 P.2d at 1320, we must determine whether or not Dr. Lewis owed a duty of due care to Martinez.[3]

According to Martinez, a physician conducting an IME for an insurance company owes an examinee a duty to use due care in formulating any opinions, diagnoses, and recommendations upon which the insurance company will rely in deciding whether to deny coverage for the examinee's treatment claims. In making this argument, Martinez relies heavily upon our decision in *Greenberg*, where we held that a physician conducting an IME owes the examinee "a duty to act with reasonable care so as not to cause her injury by referring her for testing of a type that foreseeably would result in injury based on information known to him." *Greenberg*, 845 P.2d at 538.

Our decision in *Greenberg*, however, does not necessarily lead to a conclusion here that Dr. Lewis owed a duty to Martinez. While we agreed with the plaintiff in *Greenberg* that, as a general matter, a physician owes an examinee a duty of care to conduct the exam-

---

**3.** After Martinez filed her claim, the General Assembly amended the Colorado Auto Accident Reparations Act by establishing a personal injury protection (PIP) examination program. *See* ch. 146, sec. 6, § 10–4–706, 1996 Colo. Sess. Laws 684, 686–89. Among other things, the PIP examination program provides for an IME physician selection process by which both the party requesting the IME and the party opposing the IME choose a physician to conduct the examination. *See* § 10–4–706(b)–(d), 4A C.R.S. (1996

Supp.). The PIP examination program also limits the liability of an IME physician. *See* § 10–5–706(f), 4A C.R.S. (1996 Supp.). Under the current statute, which does not apply to this case, a health care practitioner conducting an IME "shall be immune from civil liability in any action brought by any person based upon such practitioner's findings, opinions, and conclusions, absent the showing of malice or bad faith on the part of the examining health care practitioner." *Id.*

ination in a manner so as not to cause harm to the examinee, we specifically stated:

> We describe the duty no more broadly than necessary to resolve the case before us, recognizing as we do that the scope of a physician's duty of care to a nonpatient examinee raises difficult issues that should be resolved in the context of each individual case presenting such issues.

*Id.* at 538 n. 7.

In our view, the situation presented by this case differs significantly from the facts of *Greenberg.* In *Greenberg,* the IME physician referred the plaintiff for additional testing which allegedly aggravated the plaintiff's condition. *See id.* at 532–33. That is, in *Greenberg,* the tests which the physician ordered as part of his evaluation of the plaintiff caused harm to the plaintiff. Here, by contrast, Martinez alleges that Dr. Lewis's misdiagnoses and subsequent report led the insurance company to decide not to cover future treatment. That is, the harm alleged by Martinez resulted from the fact that her condition worsened during the period she did not receive treatment. That period of non-treatment stemmed from the insurance company's decision not to cover future benefits— a decision which allegedly was based on Dr. Lewis's negligently compiled report. Unlike the plaintiff in *Greenberg,* Martinez does not allege that Dr. Lewis harmed her during the course of his examination.[4] Because this case does not fall within the factual ambit of *Greenberg,* we must determine whether the underlying facts of this case give rise to a duty under the factors we described in the *Greenberg* opinion.

### A.

█ Whether a particular defendant owes a duty to a particular plaintiff is a question of law. *See Connes,* 831 P.2d ,at 1320. In circumstances where a physician examines a person at the request of a first-party insurance company, a court should take into account the nature of the services to be performed, the circumstances surrounding the request for service, and whether the physician obtains information during the performance of the services which would suggest to the physician a need to proceed with care in order to avoid injury to the examinee. *See Greenberg,* 845 P.2d at 534–35.

█ Ultimately, the determination of the existence of a duty is "essentially one of fairness under contemporary standards— that is, would reasonable persons recognize and agree that a duty of care exists." *Id.* at 536. Relevant to a court's consideration are the following factors: the risk involved, the foreseeability and likelihood of injury as weighed against the social utility of the defendant's conduct, the magnitude of the burden of guarding against the harm, and the consequences of placing the burden of a duty on the defendant. *See id.* We now turn to an examination of these factors in light of the facts of this case.

### B.

We first note the context in which Dr. Lewis's examinations of Martinez occurred. Following the automobile accident in which Martinez was involved, Martinez sought psychological and psychiatric treatment from her own health care providers. Martinez does not contend that she sought medical advice or treatment from Dr. Lewis, that he advised her in any way, that he failed to inform her about an unknown condition, or that he injured her during the course of the examination.

The agreement between State Farm and Dr. Lewis was solely for the insurance company's benefit. Under that agreement, Dr. Lewis's obligations were to report to State Farm his opinions regarding the diagnosis, prognosis, and other pertinent information

---

4. In drawing this distinction, we emphasize that a determination of whether or not a duty exists under *Greenberg* does not turn on a physician or health care provider causing *physical* injury to the examinee. It is entirely possible that a duty of care could arise while a physician or other health care provider conducts an evaluation of an examinee's mental health. For instance, if the physician or health care provider conducted an evaluation in a manner that worsened the examinee's mental health and the physician or health care provider knew or should have known about information that would have cautioned against conducting the examination in that manner, a duty might well arise under *Greenberg.*

regarding any treatment Martinez might need. Thus, as the court of appeals explained, no physician-patient relationship existed between Dr. Lewis and Martinez. *See id.*

We consider next the risk involved to an examinee, such as Martinez, created by an unfavorable IME report upon which an insurance company will rely in denying coverage. As we explained, the risk here is not that the physician will injure the examinee during the course of the examination, as was the risk we considered in *Greenberg.* Rather, the risk here is that a misdiagnosis will lead the insurance company to deny coverage for benefits to which the examinee claims she is entitled. While significant concerns are raised by the scenario in which an insurance company wrongly denies coverage for treatment the company is contractually bound to provide, that type of risk is qualitatively different from the risk that a physician will actually harm the patient while examining the patient. In our view, a plaintiff's alternative avenues of relief against the insurance company—such as actions based on the breach of the duty of good faith and fair dealing, breach of contract, and violations of the Colorado Auto Reparations Act –provide strong incentives to an insurance company to hire and rely upon physicians who will perform their IMEs adequately and competently.[5]

We also conclude that the foreseeability and likelihood of injury is outweighed by the social utility of physicians conducting IMEs without the fear of liability to the examinee based on allegations that the physician negligently submitted an examination report adverse to the examinee's treatment claims. In *Travelers Ins. Co. v. Savio,* 706 P.2d 1258, 1274 (Colo.1985), we recognized that a first-party insurance provider "must be accorded wide latitude in its ability to investigate claims and to resist false or unfounded efforts to obtain funds not available under the contract of insurance." Imposing liability on physicians in a case such as the one before us would undermine insurance providers' ability to rely on IMEs, either because physicians would be more likely to submit a report favorable to the examinee in order to avoid a subsequent law suit in which the examinee alleges the IME physician negligently made the report to the insurance company or because physicians would be less likely to perform IMEs altogether given the liability risks. *See Hafner v. Beck,* 185 Ariz. 389, 916 P.2d 1105, 1107 (Ariz.App.1995) ("If an IME practitioner's evaluations, opinions, and reports could lead not only to vehement disagreement with and vigorous cross-examination of the practitioner in the claims or litigation process, but also to his or her potential liability for negligence, the resulting chilling effect would be severe.").

The magnitude of the burden on IME physicians and the consequences of imposing a duty also militate against finding a duty here. As we explained, were we to burden IME physicians with liability to the examinee for their recommendations to the insurance company, we would undermine the ability of insurance providers to utilize IMEs to confirm or reject a claimant's need for medical treatment. This conclusion is consistent with the General Assembly's recent change to the Colorado Auto Accident Reparations Act and its decision to limit an IME practitioner's liability for his or her findings, opinions, and conclusions to instances in which the practitioner acted with malice or in bad faith. *See supra* note 3.

■ Accordingly, we hold that Dr. Lewis did not owe Martinez a duty of care. We note that this conclusion is in accord with virtually every other court to consider this issue. For example, in *Felton v. Schaeffer,* 229 Cal.App.3d 229, 279 Cal.Rptr. 713, 716–19 (Cal.App.1991), the court rejected the plaintiff's argument that the physician in that case breached a duty owed to the plaintiff when the physician allegedly misdiagnosed the plaintiff in a physical examination and consequently recommended that the plaintiff was not suitable for a particular job. The *Felton* court stated:

---

5. In her complaint, Martinez asserted these very claims for relief against State Farm (i.e., violation of the Colorado Auto Reparations Act, breach of contract, and breach of the duty of good faith and fair dealing). At oral argument, counsel for Martinez indicated that Martinez in fact had recovered on the breach of good faith and fair dealing claim against State Farm.

We independently have reviewed out-of-state authorities and find overwhelming agreement that a physician has no liability to an examinee for negligence or professional malpractice absent a physician/patient relationship, except for injuries incurred during the examination itself.

*Felton*, 279 Cal.Rptr. at 716;[6] *see also Hafner*, 916 P.2d at 1108 (citing cases and concluding that the vast majority of courts have not found a duty).

In so holding, we emphasize that the absence of a physician-patient relationship under *Greenberg* is not dispositive as to the existence of a duty.[7] We therefore disapprove the court of appeals' statement in dicta that it agrees with other non-Colorado cases that in "the absence of a physician-patient relationship . . . there is no duty of due care owed by the doctor to the examinee." *Martinez*, 942 P.2d at 1223. Having considered the factors we delineated in *Greenberg*, however, we conclude that Dr. Lewis did not owe a duty to Martinez.

### III. The CCPA Claim

The Colorado Consumer Protection Act prohibits numerous trade practices defined as deceptive. *See* §§ 6–1–105 to –105.5, 2 C.R.S. (1998). For example, the CCPA prohibits a person from knowingly making false representations as to the characteristics, uses, or benefits of services the person provides in the course of his or her business, vocation, or occupation. *See* § 6–1–105(e). Section 6–1–113(1), 2 C.R.S. (1998), the section of the CCPA at issue here, establishes private damages for violations of the Act.[8] Entitled "Damages," section 6–1–113 provides in pertinent part:

> The provisions of this article shall be available to *any person* in a civil action for any claim against any person who has engaged in or caused another to engage in any deceptive trade practice listed in section 6–1–105 or 6–1–105.5.

§ 6–1–113(1), 2 C.R.S. (1998) (emphasis added).[9]

The court of appeals held that Martinez could not assert an action under section 6–1–113(1). *See Martinez*, 942 P.2d at 1226. The court of appeals explained:

> Here, plaintiff does not assert that Lewis made misrepresentations to her or that she relied on his misrepresentations. Nor is

**6.** The *Felton* court strongly criticized the only two cases it found that departed from the majority view: *Ewing v. St. Louis–Clayton Orthopedic Group, Inc.*, 790 F.2d 682 (8th Cir.1986), and *Armstrong v. Morgan*, 545 S.W.2d 45 (Tex.Civ. App.1976). *See Felton*, 279 Cal.Rptr. at 717 n. 3. In questioning *Armstrong*, a case upon which Martinez relies, the *Felton* court observed:
The first case, *Armstrong v. Morgan*, 545 S.W.2d 45 (Tex.Civ.App.1976), although concluding a duty existed to an examinee, grounded its holding on only two authorities—a quotation from Prosser and an A.L.R. annotation. However, the cited annotation (found at 10 A.L.R.3d 1071) contains many of the same cases we cite below as *supportive of the opposite and majority view* of no duty, and hence undercuts rather than supports *Armstrong*. Moreover, *Armstrong* is a Texas case, yet makes no effort to reconcile its result with the contrary conclusion reached by *Lotspeich [v. Chance Vought Aircraft*, 369 S.W.2d 705 (Tex.Civ.App.1963)]. In light of the weak authority for *Armstrong's* conclusion and the status of Texas law (both before and after *Armstrong* ), *Armstrong* is of questionable strength. *Id.*

**7.** In *Greenberg*, we found a duty to exist notwithstanding the fact that there was not a physician-patient relationship. We stated:

[I]n the present case we conclude that the absence of a physician-patient relationship between the parties does not preclude recognition that Greenberg was subject to a duty to act carefully in referring Perkins for the functional capacity evaluation by virtue of his affirmative conduct that had the potential to create a risk of harm to Perkins.
*Greenberg*, 845 P.2d at 537.

**8.** The CCPA vests concurrent enforcement responsibility with the attorney general and the district attorneys of the several judicial districts of Colorado. *See* § 6–1–103, 2 C.R.S. (1998). Section 6–1–112(1)–(2), 2 C.R.S. (1998), establishes civil penalties for violations of the CCPA. Under section 6–1–112, the attorney general or a district attorney may petition for the recovery of a civil penalty against a defendant who violated the CCPA or caused another to violate the CCPA. *See* § 6–1–112(1)–(2). The civil penalty is paid to the state's general fund. *See id.*

**9.** The CCPA defines "person" to mean "an individual, corporation, business trust, estate, trust, partnership, unincorporated association, or two or more thereof having a joint or common interest, or any other legal or commercial entity." § 6–1–102(6), 2 C.R.S. (1998).

there evidence that any misrepresentation was made to the public. Rather, Lewis' conduct occurred in the context of the contract between Lewis and State Farm. *Id.* Because Dr. Lewis allegedly misrepresented his qualifications to State Farm and not to Martinez or the public, the court of appeals concluded that Martinez was not within the class of persons the CCPA was intended to protect. *See id.* We likewise conclude that Martinez's claim did not fall within the purview of the CCPA.

### A.

The parties offer very different views of the proper interpretation of section 6–1–113(1). Martinez would have us construe the statute in an unqualified manner allowing anyone to sue under the CCPA even if, as here, the alleged misrepresentation was not public and was limited to two private parties, neither of whom is the plaintiff suing under the CCPA. By contrast, Dr. Lewis and several of the parties submitting amicus curiae briefs would have us limit the availability of the CCPA to consumers only. Thus, under Dr. Lewis's interpretation of the statute, a party making public misrepresentations could be sued under section 6–1–113(1) only by consumers of the defendant's goods or services. We disagree with both parties' interpretations.

In the companion case of *Hall v. Walter*, 969 P.2d 224 (Colo.1998), we considered this same issue regarding the meaning of the phrase "any person" for purposes of section 6–1–113. In that case, the respondents, the Walters, had suffered injury to their real property as a result of misrepresentations made by the petitioners, Hall and Hammond. Hall and Hammond were real estate brokers offering lots for sale on land adjacent to the Walters' property. Hall and Hammond widely advertised the lots and represented to actual and potential purchasers that a road on the Walters' property was a proper means of access to the lots. In fact, no easement or license existed for such use of the Walters' road. At trial, the Walters presented evidence of injury including the loss of opportunities to lease pastures through which the

road ran. A jury determined that Hall and Hammond's misrepresentations and actions had caused the Walters' injury. The jury returned a verdict awarding the Walters $72,000 in actual damages. The trial court subsequently awarded treble damages pursuant to section 6–1–113. *See Hall*, 969 P.2d at 227–229. After the court of appeals affirmed the treble damages award, we affirmed the court of appeals' judgment. *See id.* at 238.

■ In *Hall*, we announced the standard for whether a private remedy is available under the CCPA. We held that a plaintiff must establish five distinct elements to sustain a private cause of action under section 6–1–113:

(1) that the defendant engaged in an unfair or deceptive trade practice; (2) that the challenged practice occurred in the course of defendant's business, vocation, or occupation; (3) that it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property; (4) that the plaintiff suffered injury in fact to a legally protected interest; and (5) that the challenged practice caused the plaintiff's injury.

*Hall*, 969 P.2d at 235. We now apply the *Hall* analysis to the facts of the case before us.

### B.

In reviewing a motion for summary judgment, we resolve inferences regarding undisputed facts in a manner favorable to the nonmoving party. *See Greenwood Trust Co. v. Conley*, 938 P.2d 1141, 1149 (Colo.1997). In this case our analysis may consider all of the material facts before us because these facts are not in dispute. *See id.*

The first three elements of our analysis determine whether the defendant's actions fall under the purview of the CCPA. *See Hall*, 969 P.2d at 236. To survive Dr. Lewis's motion for summary judgment on the CCPA claim, Martinez must allege facts sufficient to support an inference that Dr. Lewis engaged in an unfair or deceptive trade practice. Martinez alleges that Dr. Lewis misrepresented his qualifications and services to

State Farm when he was hired to examine Martinez. Specifically, she alleges that he represented himself as able to diagnose organic brain injury when he was not, in fact, competent to do so and that he relied, in his evaluations, on tests that he knew or should have known were inappropriate for the contexts in which he used them.

We find that Martinez, indeed, has alleged that Dr. Lewis "[k]nowingly ma[de] a false representation as to the characteristics, ... uses, [or] benefits" of his services. § 6–1–105(e). This conduct, if proven, constitutes a deceptive practice. Because it undisputedly occurred in the course of Dr. Lewis's business practice, Martinez's allegations satisfy the first two elements of the *Hall* analysis.

The third element of the analysis requires that the challenged conduct significantly impact the public as actual or potential consumers of the defendant's goods, services, or property. *See Hall*, 969 P.2d at 235. In *Hall*, we found that the defendants' actions met this part of the analysis because they occurred in the course of advertising real property to the public and implicated numerous actual and potential consumers. *See id.* at 235. The case now before us presents different circumstances because Dr. Lewis's alleged deceptive practices occurred only in the context of his private agreement to provide services for State Farm. State Farm was the sole consumer of Dr. Lewis's services. It used his services to assist its insurance coverage decisions. Thus, we consider whether misrepresentations involving a single consumer like State Farm significantly impact the public as consumers of Dr. Lewis's services.

Some of the considerations relevant to whether a challenged practice significantly impacts the public as consumers are the number of consumers directly affected by the challenged practice, the relative sophistication and bargaining power of the consumers affected by the challenged practice, and evidence that the challenged practice previously

has impacted other consumers or has significant potential to do so in the future.

First, under the facts before us, State Farm is the only "person" implicated as a consumer of Dr. Lewis's services. Such circumstances suggest "a purely private wrong." *See United States Welding, Inc. v. Burroughs Corp.*, 615 F.Supp. 554 (D.Colo. 1985). Second, State Farm is a large insurance provider that relies on the assistance of experts like Dr. Lewis in making a broad range of coverage decisions. State Farm is not the type of consumer that the CCPA generally contemplates requiring protection.

The CCPA provides consumers who are in a position of relative bargaining weakness with protection against a range of deceptive trade practices. A review of the prohibited practices, defined primarily in section 6–1–105, indicates that they serve essentially to prevent injury created by false or misleading information. *See, e.g.,* § 6–1–105(a) to –105(g) (making false representations as to various qualities or characteristics of goods or services); § 6–1–105(i) to –105(k) (advertising in a way that creates false or misleading expectations with respect to the price or availability of goods or services). These provisions protect the public as consumers in situations where consumers do not have and cannot reasonably gain access to truthful information relevant to a contemplated transaction unless it comes from the person offering the good, service, or property.

Unlike the consumers contemplated by the CCPA, State Farm has ample access to information regarding appropriate qualifications and practices for experts offering to conduct medical evaluations, and it has extensive experience as a consumer of this type of service. As a large organization with substantial resources, it is in a position of relative bargaining strength when it solicits the services of experts to assist with insurance coverage decisions.[10]

Finally, there is no allegation that consumers of Dr. Lewis's services were previously affected by his alleged misrepresentations or

---

**10.** We note that Martinez had viable claims against State Farm for a variety of statutory and common law violations related to its denial of her coverage claims including any negligent or willful reliance on Dr. Lewis's erroneous recommendations. She elected to settle those claims separately.

likely to be so affected in the future. We conclude that Dr. Lewis's alleged deceptive practices do not, under these facts, significantly impact the public as consumers of his services. Therefore, we agree with the court of appeals that the CCPA was not intended as a remedy in such circumstances. *See Martinez v. Lewis*, 942 P.2d 1219, 1226 (Colo. App.1996).

■ Because Martinez's claim fails to establish the third element of our analysis, we do not reach the fourth and fifth elements. We reiterate, however, that if Dr. Lewis's alleged deceptive practice had significantly impacted the public as consumers of his services, Martinez would have been required to show that she suffered injury in fact to an interest legally protected under the CCPA and that Dr. Lewis's alleged violation caused the injury. *See Hall*, 969 P.2d at 235. In *Hall* we found that property, particularly business property, was a legally protected interest under the CCPA. *See id.* 236–237. Here, we need not reach the question of whether Martinez's interests, arising primarily from personal injury, are legally protected under the CCPA.

## IV.

For the foregoing reasons, we affirm the judgment of the court of appeals. Dr. Lewis did not owe Martinez a duty of care and, consequently, Martinez could not proceed on her negligence claim against him. Because the alleged misrepresentations did not significantly impact the public as consumers of Dr. Lewis's services, Martinez was also precluded from pursuing a claim against him for violations of the CCPA. Accordingly, we affirm the court of appeals' judgment upholding the trial court's grant of summary judgment in favor of Dr. Lewis.

JUSTICE SCOTT concurs.

JUSTICE KOURLIS specially concurs.

JUSTICE SCOTT concurring:

I join in the judgment of the majority. Under these facts, Yolanda Martinez cannot bring a cause of action under the Colorado Consumer Protection Act (CCPA). Here, Frederick Lewis' misrepresentations as to his competence were conveyed to State Farm, and not to Martinez. Thus, his misrepresentations did not result in any harm caused by conduct prohibited by the CCPA, and, therefore, Martinez cannot establish a causal link between Lewis' misrepresentations and her injury, such that she would enjoy standing under the CCPA. In *Hall v. Walter*, 969 P.2d 224 (Colo.1998) (Scott, J., dissenting), the plaintiffs proved injury as a result of trespass, but the record did not reflect injury to their property as a consequence of any CCPA violation. Thus, in my view, in *Hall*, trespass damages were impermissibly trebled by the trial court. Here, similarly, Martinez did not claim injury caused by a deceptive trade practice, and therefore cannot recover under the CCPA.

Under my reading of our CCPA, where a plaintiff fails to prove a causal connection between a deceptive trade practice and actual damages, such damages cannot be trebled, nor any recovery effected. Accordingly, I concur with the judgment of the majority.

JUSTICE KOURLIS specially concurring:

I concur with the judgment of the Majority, but I write separately to clarify my understanding of the limits of a private right of action under the Colorado Consumer Protection Act ("CCPA" or "Act").

In the companion case to this action, *Hall v. Walter*, 969 P.2d 224, 235 (Colo.1998), this court held that a plaintiff must establish five things in order to have standing to bring a private claim under the CCPA: (1) that the defendant engaged in an unfair or deceptive trade practice, (2) that the challenged practice occurred in the course of defendant's business, vocation, or occupation; (3) that it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property; (4) that the plaintiff suffered injury in fact to a legally protected interest; and (5) that the challenged practice caused the plaintiff's injury. *See id.* I dissented from the court's decision in that case because the Majority's test extended standing to plaintiffs who were not consumers.

Indeed, the Majority's decision allowed recovery of treble damages by plaintiffs who were not even targets of the deceptive trade practice.[11]

In this case, the court holds that Martinez cannot assert a private claim under the CCPA because she fails the third prong of the Majority's test in *Hall*; that is, she fails to establish that Dr. Lewis's alleged misrepresentations to State Farm significantly impacted the public as actual or potential consumers of the doctor's services. *See maj. op.* at 222.

I would reach that same result for the reason that I articulated in *Hall*: a plaintiff cannot recover under the CCPA unless she is an actual or potential consumer of the defendant's goods or services. Dr. Lewis was hired by State Farm to examine Martinez for purposes of evaluating her insurance claim. He was not Martinez's treating physician, nor, as the court concludes today, did he owe her a duty of care. Indeed, Martinez was never exposed to any of Dr. Lewis's alleged misrepresentations.

Thus, Martinez was not a consumer of Dr. Lewis's services, and she therefore did not have standing to bring a private action under the CCPA. Accordingly, I concur with the judgment of the Majority.

---

**11.** In *Hall*, the defendants misrepresented to prospective purchasers of real estate that the available lots were accessible by a road on the plaintiffs' property. One of the defendants cut the locks on gates the plaintiffs had erected to protect access to their property. Moreover, the plaintiffs lost potential lessors of their land because the gates surrounding the property were constantly being cut open.

The trial court found that the plaintiffs suffered property damage as a result of the defendants' trespass. Because that trespass was a consequence of the defendants' public misrepresentation, this court affirmed the holding that plaintiffs were entitled to treble damages under section 6–1–113 of the CCPA despite the fact that the plaintiffs were not consumers nor even exposed to the defendant's deceptive trade practice. *See Hall,* 969 P.2d at 238.