JUSTICE SAMOUR, dissenting.
I. Introduction
¶ 80 I respectfully dissent because I disagree with the majority's holding that Murillo's competency evaluation report is protected by the physician-patient or psychologist-client *534 privilege and is inaccessible to Zapata.[1] In my view, Zapata was entitled to Murillo's competency evaluation report, and the trial court's failure to afford him access to it was erroneous. Further, although I agree with the majority's conclusion regarding the trial court's admission of res gestae evidence, I feel compelled to briefly comment on the concurring opinion.
II. Analysis
A. Privileges and Waiver
¶ 81 The majority concludes that, depending on the qualifications and training of the evaluator, either the physician-patient privilege or the psychologist-client privilege automatically attaches during the performance of any court-ordered competency evaluation in a criminal case. Moreover, according to the majority, the waiver created by subsection 16-8.5-104(1), C.R.S. (2018), is limited to the parties and the judge in the case in which the competency evaluation is completed. Therefore, the majority determines that Zapata had no right to access the report of the competency evaluation performed on Murillo in Murillo's case.[2]
¶ 82 I address the physician-patient and psychologist-client privileges first and then proceed to discuss the statutory waiver. Because I conclude that Murillo's competency evaluation report is not protected by either privilege, I would not reach the waiver issue.[3] I do so here because I disagree with the majority's interpretation of subsection 16-8.5-104(1).
1. Physician-Patient and Psychologist-Client Privileges
¶ 83 Court-ordered competency evaluations must be conducted by (1) a licensed physician who is a psychiatrist and who is trained in forensic competency assessments or a licensed psychologist who is trained in forensic competency assessments, (2) a psychiatrist who is in forensic training and practices under the supervision of a psychiatrist with expertise in forensic psychiatry, or (3) a psychologist who is in forensic training and practices under the supervision of a licensed psychologist with expertise in forensic psychology. § 16-8.5-101(2), C.R.S. (2018).[4] The question, then, is whether the report completed following Murillo's competency evaluation is protected by the physician-patient privilege or the psychologist-client privilege.[5]
*535 Because the answer necessarily depends on the scope of each privilege, I examine the statutory definition of each privilege first.
¶ 84 In Colorado, the physician-patient and psychologist-client privileges are governed by subsection 13-90-107(1), C.R.S. (2018). That statute prohibits a physician from being "examined without the consent of his or her patient as to any information acquired in attending the patient that was necessary to enable him or her to prescribe or act for the patient." § 13-90-107(1)(d). It also provides that a psychologist "shall not be examined without the consent of the ... client as to any communication made by the client to the [psychologist]" or as to any "advice given" by the psychologist to the client "in the course of professional employment." § 13-90-107(1)(g).
¶ 85 The majority concludes that Murillo's competency evaluation report is protected by the physician-patient privilege and the psychologist-client privilege. Maj. op. ¶¶ 31-40. As to the former, the majority finds that Murillo was his evaluator's "patient" and that the evaluator acquired information in "attending" Murillo that was "necessary to enable" him "to act" for Murillo. Id . at ¶¶34-39. As to the latter, the majority finds that Murillo was his evaluator's "client" and that Murillo's communications to his evaluator were "in the course of professional employment."[6] Id . at ¶34.
¶ 86 Respectfully, the majority futilely attempts to pound the square peg of competency evaluation reports into the round hole of the physician-patient and psychologist-client privileges. I do not believe this ruling is tenable for multiple reasons. First, subsection 16-8.5-105(2), C.R.S. (2018), which addresses the protection of "[s]tatements made by the defendant in the course of the [competency] evaluation," does not contemplate protecting competency evaluation reports under the umbrella of the physician-patient and psychologist-client privileges. Second, the plain language in subsections 13-90-107(1)(d) and (1)(g) reflects that the physician-patient and psychologist-client privileges do not apply to competency evaluation reports. Third, the majority misunderstands subsections 13-90-107(1)(d) and (1)(g) and overlooks our decision in Martinez v. Lewis , 969 P.2d 213 (Colo. 1998). And finally, covering competency evaluations with the protective cloak of the physician-patient and psychologist-client privileges does not further the policies behind those privileges.
¶ 87 Subsection 16-8.5-105(2) fails to mention the physician-patient privilege, the psychologist-client privilege, or section 13-90-107. Had the legislature intended to afford a competency evaluation report the protection of the physician-patient privilege or the psychologist-client privilege (or any other privilege in section 13-90-107 ), it presumably would have done so in subsection 16-8.5-105(2).
¶ 88 The only protection subsection 16-8.5-105(2) affords statements made by the defendant during a competency evaluation is as set forth in section 16-8.5-108, C.R.S. (2018), which is titled "Evidence." § 16-8.5-105(2). Neither we nor divisions of the court of appeals have previously had occasion to interpret section 16-8.5-108. But its counterpart in the insanity arena, section 16-8-107, C.R.S. (2018), which is also titled "Evidence" and is nearly identical, has been repeatedly construed by divisions of the court of appeals as protecting only the defendant's privilege against self-incrimination under the Fifth Amendment to the United States Constitution. See People v. Herrera , 87 P.3d 240, 247 (Colo. App. 2003) ("The insanity statute protects [the privilege against self-incrimination] by limiting evidence obtained during [a sanity] examination to a defendant's mental condition" under " § 16-8-107(1)(a), (1.5)(a)."); id. at 250 (subsections "16-8-107(1)(a) and (1.5)(a)," along with other statutory provisions, "protect a defendant's privilege against self-incrimination by limiting the use of evidence" to certain purposes); see also People v. Bondurant , 2012 COA 50, ¶ 45, 296 P.3d 200, 210 (the General Assembly "replaced the express protection against self-incrimination with the provision that statements made by the defendant in the course of [a sanity] examination shall be protected as provided in *536 section 16-8-107") (quotation and original alteration omitted).
¶ 89 The division of the court of appeals in this case incorrectly read section 16-8.5-108 as relevant to the psychologist-client privilege. See People v. Zapata , 2016 COA 75M, ¶¶ 26-31, --- P.3d ----. The majority makes the same mistake in an attempt to harmonize its holding-that competency evaluation reports are confidential and privileged pursuant to subsections 13-90-107(1)(d) and (1)(g)-with the inescapable reality that the information in such reports is regularly used in open court during competency hearings, restoration hearings, jury trials, and sentencing hearings. Maj. op. ¶ 40 n.3.
¶ 90 Moreover, the plain language in subsections 13-90-107(1)(d) and (1)(g) does not include competency evaluation reports. First, as it relates to the physician-patient privilege, Murillo was not a "patient" of the evaluator. § 13-90-107(1)(d). Nor does the report contain information that was acquired while "attending" Murillo or that was "necessary to enable" the evaluator "to prescribe or act for" Murillo. Id . Rather, as part of Murillo's criminal case, and without first obtaining Murillo's agreement or consent, the court ordered the department of human services to have one of its evaluators (1) conduct a competency evaluation of Murillo, (2) prepare a written report of the evaluation, and (3) deliver the report to the clerk of the court so that a copy of it could then be forwarded to the prosecutor and defense counsel. Because the evaluator was not Murillo's treating physician and did not obtain any information while attending to him, much less information that was necessary to allow him to prescribe or act for Murillo, the competency evaluation report does not fall within the scope of the physician-patient privilege.
¶ 91 The psychologist-client privilege is equally inapplicable. Murillo was not a "client" of the evaluator. § 13-90-107(1)(g). Nor did Murillo make any communication to the evaluator "in the course of [Murillo's] professional employment" of the evaluator. Id. The evaluator was not professionally employed by Murillo, and Murillo and the evaluator did not have a professional employment relationship. Rather, the evaluator evaluated Murillo pursuant to an order issued by the court.
¶ 92 The majority misconstrues subsections 13-90-107(1)(d) and (1)(g). It insists that competency evaluations must be protected by the privileges because they "are utilized for diagnostic and treatment purposes." Maj. op. ¶ 36. Although the premise of this contention is technically correct, it is out of context. The purpose of a court-ordered competency evaluation in a criminal case is not to provide health care to the defendant by diagnosing or treating illnesses or conditions from which he may suffer. To the extent that there is a diagnosis in a competency evaluation, it is for the sole purpose of complying with the court's order to form and document certain opinions related to the defendant's competency. See § 16-8.5-105(5) (requiring the evaluator to provide "[a]n opinion as to whether the defendant suffers from a mental disability or developmental disability," a "diagnosis and prognosis" of any such "mental disability or developmental disability," and "[a]n opinion as to whether the defendant is competent to proceed"). Likewise, to the extent that any treatment takes place during an evaluation, it is for the sole purpose of complying with the court's order to attempt to restore an incompetent defendant to competence. See § 16-8.5-111(2), C.R.S. (2018) (discussing the court's options when restoration is appropriate). In neither case does the evaluator act as the defendant's physician, psychologist, or health care provider; in neither case is the defendant a patient or a client of the evaluator; and in neither case does the defendant receive diagnostic care, treatment, or any other type of health care at his request (or even with his agreement or consent) from a physician, psychologist, or health care provider.
¶ 93 The majority next avers that evaluators "attend" to defendants during competency evaluations, as required by the physician-patient privilege. Maj. op. ¶¶ 34-36. But this ignores the nature of competency evaluations, which is not at all consistent with a physician "attend[ing]" to his patient. As relevant here, the word "attend" is defined as "to look after," "to go or stay with as a ... nurse," and "to visit professionally especially *537 as a physician." Attend , Merriam-Webster's Online Dictionary, https://merriam-webster.com /dictionary/attend [https://perma.cc/7L72-R75S]. An evaluator ordered by the court in a criminal case to perform a competency examination does not "look after" the defendant, "go or stay with" the defendant as a nurse, or "visit" the defendant "professionally" as a physician would do with his patient. Rather, he evaluates the defendant for competency because he is ordered to do so by the judge presiding over the defendant's criminal case.
¶ 94 The analysis by the majority then turns conclusory. The majority admittedly "take[s] it as a given" that evaluators act "in the course of professional employment," as required by the psychologist-client privilege. Maj. op. ¶ 34. In my view, that proposition is not "a given." While evaluators no doubt act "in the course of professional employment" with the department of human services as they perform court-ordered competency evaluations, that is not what subsection (1)(g) requires. Subsection (1)(g) provides that the psychologist-client privilege protects "any communication made by the client to the [psychologist] ... in the course of professional employment." § 13-90-107(1)(g). This cannot possibly mean what the majority apparently thinks it means-that any communication by a client to a psychologist, during a time when the psychologist is professionally employed somewhere by someone, is protected by the psychologist-client privilege. Instead, subsection (1)(g) must be read as referring to a communication by a client to a psychologist during the course of professional employment between the client and the psychologist . Because an evaluator performing a court-ordered competency evaluation is not professionally employed by and has no professional employment relationship with any defendant he evaluates, competency evaluation reports are not protected by the psychologist-client privilege.
¶ 95 The majority further contends that the information in a competency evaluation report is covered by the physician-patient privilege because "acquiring that information enables the evaluator to act for the defendant." Maj. op. ¶ 38. However, an evaluator ordered by the court to perform a competency evaluation does not "prescribe or act" for the defendant, as subsection 13-90-107(1)(d) requires. Rather, in contrast to a physician who prescribes or acts to diagnose or treat his patient at his patient's behest, an evaluator acts at the court's request to assess the defendant's competency. Thus, the information in a competency evaluation report is not necessary to prescribe or act for the defendant; it is necessary to enable the evaluator to comply with the court's order and, by extension, with subsections 16-8.5-103(2), C.R.S. (2018) (discussing court-ordered competency evaluations) and 16-8.5-105(5) (explaining the required contents of competency evaluation reports).
¶ 96 In addition to misconstruing the plain language of subsections 13-90-107(1)(d) and (1)(g), the majority pays no attention to our decision in Martinez . Although Martinez involved a medical malpractice claim, it is instructive.
¶ 97 Martinez was involved in a car accident, and Dr. Lewis performed an independent medical evaluation at the request of State Farm Mutual Automobile Insurance Company (State Farm), Martinez's insurer. 969 P.2d at 215-16. In analyzing whether Dr. Lewis owed Martinez a duty, we listed a number of factors that must be considered: "the risk involved," balancing "the foreseeability and likelihood of injury" against "the social utility of the [physician's] conduct," the extent of "the burden of guarding against the harm," and any "consequences of placing the burden of a duty on the defendant." Id . at 218. In applying these factors, we reviewed the context in which Dr. Lewis's evaluation of Martinez occurred and contrasted Martinez's health care providers with Dr. Lewis. Id . We explained that "Martinez sought psychological and psychiatric treatment from her own health care providers " and did not contend "that she sought medical advice or treatment from Dr. Lewis , that he advised her in any way, that he failed to inform her about an unknown condition, or that he injured her during the course of the examination." Id . (emphases added). We further observed that, under State Farm's agreement with Dr. Lewis, which was for State Farm's *538 sole benefit, "Dr. Lewis's obligations were to report to State Farm his opinions regarding the diagnosis, prognosis, and other pertinent information regarding any treatment Martinez might need." Id . at 218-19. Therefore, we agreed with the court of appeals that "no physician-patient relationship existed between Dr. Lewis and Martinez." Id . at 219.
¶ 98 Similarly, here, Murillo did not seek medical advice or treatment from the evaluator, and the evaluator did not advise him in any way or diagnose any condition. Moreover, pursuant to the court's order, the evaluator's obligation was to report to the court in writing the opinions and information required by subsection 16-8.5-105(5). Thus, just as no physician-patient relationship was formed between Dr. Lewis and Martinez, no physician-patient relationship or psychologist-client relationship was formed between Murillo's evaluator and Murillo.
¶ 99 Although the majority turns a blind eye to Martinez , it nevertheless reasons that competency evaluations are privileged because they are conducted largely for the defendant's benefit. I take issue with this supposition. While it is now axiomatic that it is unconstitutional to try an incompetent defendant, competency evaluations are ordered and completed for the benefit of the court (not the defendant), in order to afford the court an opportunity to make a fair and reliable determination regarding the defendant's competency to proceed. Indeed, it is not unusual for defendants and defense counsel to object to court-ordered competency evaluations.
¶ 100 Lastly, I disagree that extending the aegis of the physician-patient and psychologist-client privileges to competency evaluations serves the purposes behind those privileges. The purpose of the privileges is "to enhance the effective diagnosis and treatment of illness by protecting the patient from the embarrassment and humiliation that might be caused by the ... disclosure of information imparted ... by the patient during the course of a consultation." Clark v. Dist. Court , 668 P.2d 3, 8 (Colo. 1983) ; see also People v. Sisneros , 55 P.3d 797, 800 (Colo. 2002). That purpose is in no way achieved by casting the protective net of the physician-patient and psychologist-client privileges so wide as to snare court-ordered competency evaluation reports, which must be distributed to the court, the prosecutor, and defense counsel, see § 16-8.5-105(4), and which are regularly discussed in open court during competency hearings, restoration hearings, jury trials, and sentencing hearings.
¶ 101 Yet, Zapata was improperly denied access to Murillo's competency evaluation report based on the physician-patient and the psychologist-client privileges. As a result, Zapata was forced to proceed to trial without the report, even though (1) Murillo testified as a prosecution witness against Zapata in Zapata's case, (2) Murillo was asked about and discussed the convenience store attack during his competency evaluation, (3) the prosecutor, defense counsel, and the judge in Murillo's case all received a copy of the report, (4) the prosecutor in Zapata's case had access to the report because he was the same prosecutor in Murillo's case, and (5) since the same judge presided over both cases, the judge in Zapata's case, too, had access to the report. The majority's decision today ratifies this denial of access due to its mistaken interpretation of subsections 13-90-107(1)(d) and (1)(g).
2. Statutory Waiver
¶ 102 Because I do not believe the physician-patient and psychologist-client privileges apply to competency evaluation reports, I would not reach the statutory waiver issue. I address the question here, though, to express my disagreement with the majority's interpretation of subsection 16-8.5-104(1). Even if, as the majority concludes, competency evaluation reports are protected by the physician-patient and psychologist-client privileges, I would find that Zapata was nevertheless entitled to Murillo's competency evaluation report based on the waiver provision in subsection 16-8.5-104(1).
¶ 103 Subsection 16-8.5-104(1) states in pertinent part that, where, as here, "a defendant raises the issue of competency to proceed, ... any claim by the defendant to confidentiality or privilege is deemed *539 waived."[7] The legislature did not place a limit on this waiver. Instead, it stated that any claim of confidentiality or privilege by the defendant is deemed waived .
¶ 104 The majority infuses a limitation into the statute: a defendant's physician-patient and psychologist-client privileges are waived "only as to the parties and the court in that defendant's case." Maj. op. ¶ 41. It does so based largely on what follows the waiver language in subsection (1)-"and the district attorney, the defense attorney, and the court are granted access, without written consent of the defendant or further order of the court, to" certain reports, documents, information, and the evaluator. § 16-8.5-104(1). Additionally, the majority relies on the fact that four of the remaining five subsections in the statute address disclosures to the same three recipients-the court, the prosecutor, and defense counsel in the defendant's case. Maj. op. ¶ 42.
¶ 105 In my view, the majority makes too much of the references in the statute to the court, the prosecutor, and defense counsel in the criminal case. Of course the legislature referred to the court, the prosecutor, and defense counsel in the criminal case; that is not at all surprising. After all, having declared there is an automatic waiver, the legislature set forth the records, documents, and information that must be made available to the court and the parties in the case. There was no reason for the legislature to foresee-and there is no basis to believe that it foresaw or even thought about-the rare scenario that developed in this case involving a defendant who undergoes a court-ordered competency evaluation and then testifies on behalf of the prosecution against his codefendant in the codefendant's trial. But the omission of a provision addressing such an unusual case doesn't mean that the legislature intended to limit the waiver as the majority concludes.
¶ 106 Unlike the majority, I do not interpret the language used by the legislature as a deliberate limitation on the scope of the waiver. The legislature certainly did not say in the part of subsection (1) on which the majority relies that only the prosecutor, defense counsel, and the court in the case in which the competency evaluation is completed may be granted access to the listed reports, documents, and information. Nor did the legislature state in the remaining subsections of the statute that only the prosecutor, defense counsel, and the court in the case in which the competency evaluation is completed are entitled to the additional disclosures identified. Had the legislature meant to limit the scope of section 16-8.5-104 consistent with the majority's position, it could have easily done so by simply stating such a limitation.[8]
*540 ¶ 107 In short, because the legislature did not include any language limiting the scope of the waiver in subsection 16-8.5-104(1), I conclude that the waiver is not limited. Consequently, even if the physician-patient and psychologist-client privileges apply to protect Murillo's competency evaluation report, I would find that Murillo waived any claim of privilege or confidentiality as to the report.[9]
B. Res Gestae Evidence
¶ 108 I agree with the majority's conclusion regarding the evidence introduced by the trial court under the res gestae doctrine.[10] Maj. op. ¶ 5. However, the concurring opinion warrants a few observations.
¶ 109 First, the concurrence speculates that it is doubtful the trial court would have allowed under CRE 404(b) any evidence improperly admitted pursuant to the res gestae doctrine. See Conc. op. ¶ 6 (Had the trial court analyzed this evidence pursuant to the requirements of Rule 404(b), "I doubt" it "would have permitted the prosecution to use the evidence as it did."). In fact, the concurrence appears to surmise that all of the improperly admitted res gestae evidence was inadmissible under any other theory of relevance. Id . at ¶4.
¶ 110 Second, I take a moment to note that, as was the case with Mark Twain, the concurrence's report about the demise of the res gestae doctrine is greatly exaggerated. While the term "res gestae" may be losing favor, courts continue to allow res gestae evidence under a different name: "inextricably intertwined" evidence. See Edward J. Imwinkelried, The Second Coming of Res Gestae , 59 Catholic U. L. Rev. 719, 722-24 (2010); Christopher B. Mueller & Laird C. Kirkpatrick, 1 Fed. Ev. § 433 (4th ed., 2018) ("The modern de-Latinized expression uses the phrase 'inextricably intertwined' " instead of the "mind-numbing and elastic term 'res gestae[.]' "). And "the number of cases invoking the [inextricably intertwined] doctrine grows largely unabated" even "[d]espite [a] constant drumbeat of substantive criticism." Imwinkelried, supra , at 724.
¶ 111 Finally, the concurrence expresses "serious reservations about the continued appropriateness of the res gestae doctrine," see Conc. op. ¶ 1, and conveys skepticism regarding the doctrine's current usefulness, see id . at ¶¶7-9. These issues were not briefed or even raised by the parties. And, as mentioned, the majority does not resolve whether the trial court erred in admitting evidence pursuant to the res gestae doctrine. Maj. op.
*541 ¶ 5. Under these circumstances, the criticism levied against the res gestae doctrine seems premature. As the concurrence aptly acknowledges, this case is not a suitable conduit to consider whether we should continue to apply the res gestae doctrine. Conc. op. ¶ 7. Respectfully, because neither the wisdom of the doctrine's continued use nor the doctrine's present-day utility are issues before us, I believe that the most prudent course of action is to abstain from commenting on them at this time.
III. Conclusion
¶ 112 For the reasons articulated in this dissent, I respectfully disagree with the majority's holding regarding the physician-patient and psychologist-client privileges and the waiver in section 16-8.5-104. I would remand the case to the trial court with instructions to make Murillo's competency evaluation report available to Zapata and to then afford Zapata an opportunity to demonstrate that there is a reasonable probability that, had the report been disclosed to him before trial, the result of the proceeding would have been different. See Zoll v. People , 2018 CO 70, ¶ 12, 425 P.3d 1120, 1125.
I am authorized to state that CHIEF JUSTICE COATS joins in this dissent.

The majority, the court of appeals, and the parties refer to competency evaluation reports (plural). By and large, I refer to a single report because only one appears to have been filed with the trial court. After completion of the court-ordered competency evaluation, which concluded that Murillo was competent, Murillo requested leave to have an evaluator of his own choosing conduct a second competency evaluation. See § 16-8.5-106(1), C.R.S. (2018). The trial court granted the request and a second evaluation was completed. However, it appears that the report related to that second evaluation was never filed with the clerk of the court, although a copy of it was provided to the prosecution. Murillo subsequently withdrew his claim of incompetency and accepted the prosecution's plea bargain offer.

At one point, the prosecution admitted to the trial court that there were "maybe two lines about the actual incident" in Murillo's second competency evaluation report, but claimed that there was nothing in the report that was not included in a subsequent "proffer" Murillo provided the prosecution as part of his plea agreement. This statement, though, contradicted an earlier representation by the prosecution that "essentially what [Murillo] says" in his first evaluation "is he doesn't remember anything about the incident." Murillo testified during Zapata's trial that, although he did not remember the incident, he had known Zapata for six months before the attack, the convenience store's surveillance video showed him and Zapata while the attack took place, he and Zapata were not there to rob the store, and Zapata left him at the store to die.

I limit my analysis to court-ordered competency evaluations; as such, I do not address evaluations performed pursuant to section 16-8.5-106, which are requested and paid for by the defendant and completed by an evaluator chosen by the defendant.

As the majority indicates, there is no basis to believe that the competency evaluation performed on Murillo failed to comply with subsection 16-8.5-101(2). Consequently, Murillo's competency evaluation was conducted by a physician (including possibly a psychiatrist) or a psychologist.

The majority correctly states that the record does not include, under seal or otherwise, a copy of the competency evaluation report completed. Zapata attempted to make the evaluation part of the record so that it would be available for review purposes. I believe it was improper for the trial court to refuse to allow him to do so.

The majority concedes that a psychologist "offers no 'advice' (in the clinical sense) to the defendant in [the] context" of a competency evaluation. Maj. op. ¶ 31.

In full, subsection 16-8.5-104(1) provides,
When a defendant raises the issue of competency to proceed, or when the court determines that the defendant is incompetent to proceed and orders that the defendant undergo restoration treatment, any claim by the defendant to confidentiality or privilege is deemed waived, and the district attorney, the defense attorney, and the court are granted access, without written consent of the defendant or further order of the court, to:
(a) Reports of competency evaluations, including second evaluations;
(b) Information and documents relating to the competency evaluation that are created by, obtained by, reviewed by, or relied on by an evaluator performing a court-ordered evaluation; and
(c) The evaluator, for the purpose of discussing the competency evaluation.
Thus, this subsection does not reference the physician-patient or psychologist-client privilege, and does not address the waiver of either privilege; rather, it forecloses "any claim by the defendant" that the court-ordered competency evaluation is confidential or privileged.

Notably, section 16-8-103.6, C.R.S. (2018), the waiver provision governing insanity cases, contains the type of limiting language the majority injects into subsection 16-8.5-104(1). That section provides that a defendant who places his mental condition at issue, by either pleading not guilty by reason of insanity or disclosing witnesses who may testify regarding his mental condition during a capital sentencing hearing, "waives any claim of confidentiality or privilege as to communications made by the defendant to a physician or psychologist in the course of an examination or treatment for such mental condition for the purpose of any trial, hearing on the issue of such mental condition, or [capital] sentencing hearing." § 16-8-103.6. Subsection 13-90-107(3) then confirms that the physician-patient and psychologist-client privileges "shall not apply to physicians or psychologists eligible to testify concerning a criminal defendant's mental condition pursuant to section 16-8-103.6."

Unfortunately, section 16-8.5-104 is not a paragon of clarity. (This is in no way intended as a criticism of our fellow branch of government; my goal is simply to draw attention to some statutory ambiguities.) In addition to the issues already discussed, I note that the waiver in subsection 16-8.5-104(1) purportedly applies only in two scenarios: when restoration services are ordered and when the defendant raises the question of competency. Yet, there are instances in which the court or the prosecution raises the issue of competency, but the defense agrees that a competency evaluation is appropriate. Further, the court, the prosecution, and defense counsel are entitled to receive a copy of all competency evaluation reports, regardless of who raised the issue of competency. § 16-8.5-105(4). If the waiver applies in situations not currently mentioned in the statute, it is unclear when it is triggered. For example, if the defendant requests and pays for an evaluation by an evaluator of his choosing (a second evaluation), does the waiver apply when the evaluation is requested, or only if the evaluation is completed and a report is submitted to the clerk of the court pursuant to subsection 16-8.5-105(4)?

In Colorado, res gestae is simply "a theory of relevance which recognizes that certain evidence is relevant because of its unique relationship to the charged crime." People v. Greenlee , 200 P.3d 363, 368 (Colo. 2009). The theory "is based on the idea that '[c]riminal occurrences do not always take place on a sterile stage,' " and that where the events leading up to the crimes charged help explain the setting in which the crimes took place, " 'no error is committed by permitting the jury to view the criminal episode in the context in which it happened.' " People v. Galang , 2016 COA 68, ¶ 15, 382 P.3d 1241, 1245 (quoting People v. Lobato , 187 Colo. 285, 530 P.2d 493, 496 (1975) ); see also People v. Quintana , 882 P.2d 1366, 1373 (Colo. 1994) (Res gestae seeks "to provide the fact-finder with a full and complete understanding of the events surrounding the crime and the context in which the charged crime occurred."). Res gestae evidence is subject to the requirements of CRE 401 and CRE 403. People v. Relaford , 2016 COA 99, ¶ 61, 409 P.3d 490, 500 ("Res gestae evidence is admissible so long as it is relevant and its probative value is not substantially outweighed by the danger of unfair prejudice."). Thus, contrary to the concurrence's assertion, res gestae is not a "nearly standardless concept." Conc. op. ¶ 7.