FILED
United States Court of Appeals
Tenth Circuit

June 21, 2010

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

JAMES FREDERICKS; BROOKE
FREDERICKS; E.F., S.F.[*],

        Plaintiffs - Appellants,

   v.

MARY MARGARET JONSSON,
Ph.D.,

        Defendant - Appellee.

Nos. 09-1169, 09-1237

---

### APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLORADO
### (D.C. NO. 1:06-CV-00957-MSK-KLM)

---

William S. Finger, Frank & Finger, P.C., Evergreen, Colorado, (Robert A. Weinberger, Weinberger & Cavanaugh, P.C., Denver, Colorado, with him on the briefs), for Plaintiffs - Appellants.

Kathleen M. Kulasza, (Miles M. Dewhirst, Patrick J. Maggio, with her on the brief), Dewhirst & Dolven, LLC, Colorado Springs, Colorado, for Defendant - Appellee.

---

Before **HENRY**, **TACHA**, and **HARTZ**, Circuit Judges.

---

[*]Although not requested by counsel for the appellants, the court has *sua sponte* changed the full names of two of the plaintiffs-appellants in this action to just initials. This change was made in an attempt to guard in some measure the privacy of these parties, who were minors when many of the operative facts involved in this case took place.

**HARTZ**, Circuit Judge.

James and Brooke Fredericks and their daughters, E.F. and S.F., (collectively the Plaintiffs) sued Dr. Mary Margaret Jonsson, a licensed psychologist, for failing to warn them of the danger posed by Troy Wellington. Wellington had attempted to break into the Plaintiffs' home a few days after Dr. Jonsson had evaluated him for the Colorado probation department. The district court granted summary judgment in favor of Dr. Jonsson, ruling that Colorado's mental-health-professional liability statute, Colo. Rev. Stat. § 13-21-117 (Section 117), protected Dr. Jonsson from the Plaintiffs' claims.

We have jurisdiction under 28 U.S.C. § 1291 and affirm. We hold (1) that Section 117 applies in the circumstances of this case and (2) that the statute did not require Dr. Jonsson to warn the Plaintiffs because Wellington had not communicated to Dr. Jonsson any serious threat of imminent physical violence against them.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Because this appeal is from a grant of summary judgment to Dr. Jonsson, we must view the facts in the light most favorable to the nonmoving party, the Plaintiffs. *See Milne v. USA Cycling Inc.*, 575 F.3d 1120, 1122 n.1 (10th Cir. 2009). The Plaintiffs have had an unfortunate history with Wellington. Starting in 2000, when Wellington was the Plaintiffs' neighbor, he began stalking E.F. and

S.F.  This continued until January 2004, when Wellington was convicted in Colorado state court of stalking.  He was sentenced to an eight-year term of probation.  One condition of his probation was that he complete a "Mental health evaluation/counseling or treatment."  App., Vol. III at 329.

For several years before his conviction Wellington had been a regular patient of Dr. Ragnar Storaasli, his private psychologist; and Wellington continued to see Dr. Storaasli weekly after his conviction.  Dr. Storaasli did not treat Wellington with any medication.  Shortly after being placed on probation, however, Wellington was hospitalized for having suicidal thoughts following a drinking incident, and he was given antidepressant medication while hospitalized.  After his release from the hospital, Wellington saw Dr. Edward Smith in addition to Dr. Storaasli.  Dr. Smith made no change to Wellington's antidepressant prescription.

This episode apparently prompted the probation department to ask Parker, Froyd & Associates, a mental-health-services provider, to perform a full mental-health evaluation of Wellington.  According to an evaluation-request form completed by the probation department, the purposes of the evaluation were to:

- Provide Diagnostic Determination (V Axis)
- Assess Dual Diagnosis
- Assess Major Mental Illness
- Assess Risk—To Community / Re-offense
- Assess Risk—Violent or Aggressive Behavior
- Assess Risk—Victimization Potential
- Assess Risk—Suicide Potential

- Assess Need for Medication / Med. Eval.
- Assess Substance Abuse Patterns / Potential
- Assess Amenability to Treatment.

*Id.* at 327.  Wellington signed releases allowing disclosure to the probation department, Dr. Smith, and Dr. Storaasli of information relating to the evaluation.

Dr. Jonsson was the psychologist assigned to Wellington by Parker, Froyd. On May 12, 2004, she conducted her examination, which included testing and an interview.  According to Dr. Jonsson's evaluation report and Wellington's deposition testimony, Wellington told Dr. Jonsson that he used to have frequent violent fantasies involving members of the Fredericks family, but that he no longer had violent thoughts directed at them.  Dr. Jonsson did not convey any warnings to the probation department or the Plaintiffs, and she issued her report on June 30.

On May 26, 2004, two weeks after the examination, Wellington got drunk and stole a car.  He drove to the Plaintiffs' home and broke a window, apparently in an attempt to break in.  But he was frightened by a security alarm and ran into a neighbor's yard, where he was later found passed out.

In May 2006 the Plaintiffs filed a suit based on this episode in the United States District Court for the District of Colorado.  Their amended complaint named Dr. Jonsson (and a number of other individuals and entities no longer parties to this case), claiming that she had negligently failed to warn them or the probation department of the danger posed by Wellington.  Dr. Jonsson moved for

-4-

summary judgment on the ground that Section 117 protected her from liability because Wellington had not made a specific threat against the Plaintiffs. The district court granted the motion.

## II. DISCUSSION

We review de novo the district court's grant of summary judgment. *See Evers v. Regents of Univ. of Colo.*, 509 F.3d 1304, 1308 (10th Cir. 2007). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). Because the court's jurisdiction was based on diversity of citizenship, *see* 28 U.S.C. § 1332, we apply the substantive law of Colorado, *see Vitkus v. Beatrice Co.*, 127 F.3d 936, 941 (10th Cir. 1997). We begin by summarizing the scope and meaning of Section 117. We then address the Plaintiffs' arguments against application of Section 117 in this case. Finally, we apply Section 117 to the facts before us.

### A. Section 117

Section 117 provides in general that a "mental health professional . . . shall not be liable for damages in any civil action for failure to warn or protect any person against a mental health patient's violent behavior, and any such person shall not be held civilly liable for failure to predict such violent behavior." Colo.

Rev. Stat. § 13-21-117.[1]  A duty does arise, however, "where the patient has

[1]Section 117 states in full:

Civil liability—mental health care providers—no duty

A physician, social worker, psychiatric nurse, psychologist, or other mental health professional and a mental health hospital, community mental health center or clinic, institution, or their staff shall not be liable for damages in any civil action for failure to warn or protect any person against a mental health patient's violent behavior, and any such person shall not be held civilly liable for failure to predict such violent behavior, except where the patient has communicated to the mental health care provider a serious threat of imminent physical violence against a specific person or persons.  When there is a duty to warn and protect under the circumstances specified above, the duty shall be discharged by the mental health care provider making reasonable and timely efforts to notify any person or persons specifically threatened, as well as notifying an appropriate law enforcement agency or by taking other appropriate action including, but not limited to, hospitalizing the patient.  A physician, social worker, psychiatric nurse, psychologist, or other mental health professional and a mental health hospital, community mental health center or clinic, institution, or their staff shall not be liable for damages in any civil action for warning any person against or predicting a mental health patient's violent behavior, and any such person shall not be subject to professional discipline for such warning or prediction.  For the purposes of this section, "psychiatric nurse" means a registered professional nurse as defined in section 12-38-103(11), C.R.S., who by virtue of postgraduate education and additional nursing preparation has gained knowledge, judgment, and skill in psychiatric or mental health nursing.  The provisions of this section shall not apply to the negligent release of a mental health patient from any mental health hospital or ward or to the negligent failure to initiate involuntary seventy-two-hour treatment and evaluation after a personal patient evaluation determining that the person appears to have a mental illness and, as a result of the mental illness, appears to be an imminent danger to others.

Colo. Rev. Stat. § 13-21-117.

communicated to the mental health care provider a serious threat of imminent physical violence against a specific person or persons." *Id.* In that event the mental-health professional can escape liability only by "making reasonable and timely efforts to notify any person or persons specifically threatened, as well as notifying an appropriate law enforcement agency or by taking other appropriate action including, but not limited to, hospitalizing the patient." *Id.* In addition, Section 117 excludes from its scope any negligent evaluation to determine whether a patient should be involuntarily confined, or continue to be involuntarily confined, in a mental-health hospital. The statute states:

> The provisions of this section shall not apply to the negligent release of a mental health patient from any mental health hospital or ward or to the negligent failure to initiate involuntary seventy-two-hour treatment and evaluation after a personal patient evaluation determining that the person appears to have a mental illness and, as a result of the mental illness, appears to be an imminent danger to others.

*Id.* In essence, the statute recognizes, even if it does not create, a cause of action for negligence in those circumstances.

## B. Applicability of Section 117 to this Case

The Plaintiffs' arguments on appeal raise two challenges to the district court's ruling. First, they contend that Section 117 does not govern Dr. Jonsson's duty to them. Second, they contend that even if the statute applies, Dr. Jonsson had a duty to warn them about Wellington because he had communicated to her a serious threat of imminent physical violence against them.

### 1.    Does Section 117 Govern?

The Plaintiffs' arguments are not entirely clear.  But as best we can tell, they contend that Section 117 is inapplicable to their claim because (1) Dr. Jonsson did not treat Wellington but performed only what they term a "forensic" evaluation and (2) Wellington waived any rights he may have had to confidentiality from Dr. Jonsson.  They argue that the language of the statute restricts its application to a relationship between a therapist and a "patient" receiving treatment.  And they assert that "[w]hat the legislative history of [Section 117] indicates is that the purpose of the statute was to balance confidentiality in a treatment situation (in-patient and out-patient) with social need for protection of individuals who would be targeted by persons suffering mental illness."  Aplt. Br. at 33.  On this latter point, however, the Plaintiffs' brief neither cites, nor even mentions, what would ordinarily be considered legislative history, such as committee reports or floor debates.  But the brief does discuss common-law precedents at some length, so we assume that by "legislative history," the Plaintiffs mean the common-law context of the statute.  They also claim support for their position in the Colorado victim-rights statute.

We first address the language and common-law context of Section 117, and conclude that the statute applies in this case.  We then consider the Colorado victim-rights statute and conclude that it is irrelevant to the issue before us.

### a. Language and Common-Law Context of Section 117.

The Plaintiffs' best argument is based on the use of the word *patient* in Section 117. The first sentence of the statute states:

> A . . . mental health professional . . . shall not be liable for damages in any civil action for failure to warn or protect any person against a mental health *patient*'s violent behavior, and any such person shall not be held civilly liable for failure to predict such violent behavior, except where the *patient* has communicated to the mental health care provider a serious threat of imminent physical violence against a specific person or persons.

Colo. Rev. Stat. § 13-21-117 (emphases added). The statute does not define *patient*, nor does it state explicitly that it applies only when the violent person has been *treated* by the mental-health professional. But the Plaintiffs contend that the ordinary meaning of the word *patient* is a person receiving treatment.

The Plaintiffs' best example of this usage is the Colorado Supreme Court opinion in *Martinez v. Lewis*, 969 P.2d 213 (Colo. 1998). In that case Dr. Lewis conducted an independent medical examination (IME) of Martinez for her insurer "to evaluate the existence and extent of Martinez's claimed neurological injuries." *Id.* at 215. After repeated evaluations he concluded that she was faking her injuries. *See id.* at 216. She sued Dr. Lewis for negligence, alleging that he had erred in his diagnosis, resulting in her not receiving necessary treatment. *See id.* The court held that he owed her no duty to diagnose her correctly. *See id.* at 220. In explaining that a physician's duties depend on the purpose of the medical

examination, the court used the word *patient* to refer to one who is being treated, as opposed to one who is being examined only for an IME.  It wrote:

> Martinez sought psychological and psychiatric treatment from her own health care providers.  Martinez does not contend that she sought medical advice or treatment from Dr. Lewis, [or] that he advised her in any way . . . .
>     The agreement between [the insurer] and Dr. Lewis was solely for the insurance company's benefit.  Under that agreement, Dr. Lewis's obligations were to report to [the insurer] his opinions regarding the diagnosis, prognosis, and other pertinent information regarding any treatment Martinez might need.  Thus, . . . no physician-*patient* relationship existed between Dr. Lewis and Martinez.

*See id.* at 218–19 (emphasis added).

*Martinez* is certainly helpful to the Plaintiffs.  But it is hardly dispositive on the meaning of the term *patient* in a Colorado statute.  At least as compelling as the authority of *Martinez*, but in the opposite direction, is the Colorado legislature's use of the word *patient* to describe the same relationship at issue in *Martinez*.  The Colorado statute setting forth the duties of independent medical examiners, who do not provide treatment but conduct examinations only for insurance purposes, refers to the persons being examined as "patients."  Indeed, the statutory title is, "Accountability of Independent Medical Examiners to Their Patients."  Colo. Rev. Stat. § 10-16-601; *see also id.* § 10-16-602(3) (defining *patient* as "an individual covered by, or denoted as an insured, subscriber, enrollee, or purchaser under any health coverage or health benefit or health care services certificate, agreement, contract, policy, or plan.").

-10-

In addition, in the section of the psychologist licensing statute entitled "Practice of psychology defined," the Colorado legislature appears to use the word *patient* in a broader sense than the state supreme court did in *Martinez*. *See id.* § 12-43-303. The section includes within the practice of psychology several types of work that do not involve treatment. For example, the first type of work listed is "(a) Psychological testing and the evaluation or assessment of personal characteristics such as intelligence, personality, abilities, interests, and aptitudes." *Id.* And, most pertinent to this case, the list includes "(g) forensic psychology, which is the science of psychology that deals with the relation and application of psychological research and knowledge to legal issues, including, but not limited to, assessments of competency in civil or criminal matters, legal questions of sanity, or civil commitment proceedings." *Id.* Yet even though these types of work do not involve treatment, the only term used in the section to refer to a person seen by a psychologist is the word *patient*, which appears in the general definition of the practice of psychology:

> For the purposes of [the part of the Professions and Occupations Code relating to Psychologists], the "practice of psychology" is defined as the observation, description, evaluation, interpretation, treatment, or modification of behavior, cognitions, or emotions by the application of psychological, behavioral, and physical principles, methods, or procedures, for the purpose of preventing or eliminating symptomatic, maladaptive, or undesired behavior, cognitions, or emotions and of enhancing interpersonal relationships, work and life adjustment, personal effectiveness, behavioral health, and mental health. Psychologists use any and all psychological principles, methods, and devices to consider the full range of possible causes of

-11-

*patients*' illnesses and select and apply the appropriate treatment methods.

*Id.* § 12-43-303(1) (emphasis added).[2]

---

[2]The remainder of § 12-43-303 provides:

(2)  The practice of psychology includes, but is not limited to:

    (a)  Psychological testing and the evaluation or assessment of personal characteristics such as intelligence, personality, abilities, interests, and aptitudes;

    (b)  Neuropsychological tests, assessments, diagnoses, and treatment of neuropsychological and brain disorders;

    (c)  Psychotherapy, which may include psychoanalytic, existential, cognitive, and behavioral therapies, hypnosis, and biofeedback;

    (d)  Clinical and counseling psychology, which are the sciences of diagnosis and treatment of mental, neurological, psychophysiological, and emotional disorder or disability, alcoholism and substance abuse, behavioral abuse including dangerousness to self or others, and disorders of habit or conduct;

    (e)  Rehabilitation psychology, which is the science of psychology dealing with the psychological aspects of physical illness, accident, injury, or disability and rehabilitation therefrom;

    (f)  Health psychology, which is the science of psychology dealing with the role of psychological factors in health and illness;

    (g)  Forensic psychology, which is the science of psychology that deals with the relation and application of psychological research and knowledge to legal issues, including, but not limited to, assessments of competency in civil or criminal matters, legal questions of sanity, or civil commitment proceedings;

    (h)  Organizational psychology, which is the science of

(continued...)

If nothing more, the use of the term *patient* in the IME and licensing statutes reflects the unavailability of a better term to describe all persons who are seen professionally by health-care providers.

Moreover, the common-law background to Section 117 does not support the Plaintiffs' arguments. Although the Plaintiffs suggest that the common-law cases

---

[2](...continued)
assessment and intervention by an employee within his or her organization or by a consultant retained by such organization;

    (i) Community psychology, which is the science of psychology emphasizing prevention and early discovery of potential difficulties, rather than awaiting initiation of therapy by affected individuals or groups, and which is generally practiced outside of an office setting;

    (j) Sports psychology, which is the science of psychology dealing with enhancement of athletic performance utilizing principles of psychological research, assessment, and knowledge;

    (k) Psychoeducational evaluation, therapy, remediation, and consultation; and

    (l) Research psychology, which is the application of research methodologies, statistics, and experimental design to psychological data.

(3) Psychological services may be rendered to individuals, families, groups, organizations, institutions, the public, and the courts.

(4) The practice of psychology shall be construed within the meaning of this definition without regard to whether payment is received for services rendered.

Colo. Rev. Stat. § 12-43-303.

show that it is the confidential, treatment relationship between a patient and a therapist that has created limits on the liability of psychologists, a review of the cases indicates the contrary. Not only has the confidential nature of the relationship not been a ground for limiting liability, but the *treatment* of the patient has been a ground for *imposing* liability.

The general rule under the common law is that one has no duty to control the conduct of another. But an exception can arise because of a "special relation." The Restatement (Second) of Torts § 315 (1965) states the exception as follows:

> There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless,
> (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
> (b) a special relation exists between the actor and the other which gives to the other a right to protection.

The California Supreme Court invoked this exception in *Tarasoff v. Regents of the University of California*, 551 P.2d 334, 343 (Cal. 1976), the leading opinion on the liability of a mental-health professional for failure to warn or protect a third person. *Tarasoff*, cited in the Plaintiffs' opening brief on appeal, considered a suit against a psychologist by the estate of a person murdered by his patient. Of most significance to the case before us, *Tarasoff* did not treat confidentiality as a factor in its analysis of the scope of the psychologist's common-law duty. It considered confidentiality only after

-14-

balancing various considerations, such as foreseeability and the risk of unnecessary warnings, in arriving at what it believed to be the proper duty. *See id.* at 342–46. Then, in response to an argument that the duty it was recognizing would require psychologists to violate their duty of confidentiality, the court acknowledged the value of safeguarding confidentiality but concluded that this interest "must yield to the extent to which disclosure is essential to avert danger to others." *Id.* at 347. It did not indicate that the duty to warn would be broader in the absence of a confidential relationship. *McIntosh v. Milano*, 403 A.2d 500 (N.J. Sup. Ct. 1979), also cited by the Plaintiffs, adopted a similar analysis. And the Colorado Supreme Court, in its only decision regarding this common-law duty, did not include confidentiality in its analysis regarding the scope of the duty to disclose. *See Perreira v. State*, 768 P.2d 1198, 1215–20 (Colo. 1989); *see also id.* at 1209–10 n.7 (quoting *Tarasoff* regarding confidentiality). (The *Perreira* decision postdated Section 117; but the court did not apply the statute because the underlying facts arose before Section 117's effective date. *See id.* at 1210 n.8.).

Nor does the common-law background to Section 117 suggest that the duties of a nontreating psychologist are greater than those who have treated the dangerous person. *Tarasoff's* discussion of the special-relation doctrine never makes such a distinction. *See* 551 P.2d at 342–46; *see also Brady v. Hopper*, 570 F. Supp. 1333, 1337–38 (D. Colo. 1983) (applying Colorado law; discussing special relationship between *therapist* and patient), *aff'd*, 751 F.2d 329 (10th Cir.

1984).  If anything, the absence of a therapy relationship would suggest the absence of the special relation necessary to impose any duty whatsoever on the psychologist.[3]

In sum, we have been pointed to nothing in the common-law background to Section 117 suggesting that its limits on liability are confined to the context of a confidential, therapeutic relationship.  Further, the relevant analysis conducted by the mental-health provider—determining whether the person being evaluated is a danger to others—would seem to be the same whether or not the person is being treated by the provider.  It would therefore be reasonable to assume that the legislature intended the statute to address the entire subject—that is, all such assessments by mental-health providers.

This is not to say that public policy would never support imposing on mental-health professionals in certain contexts some common-law duties beyond those duties recognized in Section 117 to protect third persons from the conduct of persons they evaluate.  Indeed, Section 117 itself provides two exceptions to its general rule.  The final sentence of Section 117 states:

> The provisions of this section shall not apply [1] to the negligent release of a mental health patient from any mental health hospital or

---

[3]We note that in any event Dr. Jonsson's evaluation of Wellington was intended in part to be a first step to possible therapy.  Dr. Jonsson was directed to diagnose Wellington's condition and to assess his needs for medication and his amenability to treatment.  Hence, to the extent that the Plaintiffs' argument rests on the premise that Dr. Jonsson's evaluation of Wellington had no therapeutic purpose, the record undermines the argument.

ward or [2] to the negligent failure to initiate involuntary seventy-two-hour treatment and evaluation after a personal patient evaluation determining that the person appears to have a mental illness and, as a result of the mental illness, appears to be an imminent danger to others.

Colo. Rev. Stat. § 13-21-117. The Plaintiffs, however, do not suggest that either exception applies here. We would be arrogating to this court the authority of the Colorado legislature were we to declare an additional exception.

### b.       Effect of Colorado Victim-Rights Statute

The Plaintiffs contend that the Colorado victim-rights statute supports their claim that Section 117 is inapplicable here. They argue as follows:

> As crime victims, [they] were entitled to protection pursuant to the provisions of C.R.S. § 24-4.1-301, *et seq.*, relating to assurances of rights of victims and witnesses to crimes. The declaration of the act specifically sets forth that [sic] the intent to ensure that all victims of and witnesses to crimes are guaranteed *certain protections under the law*. Rights to justice and due process are ensured under C.R.S. § 24.4.1-302.5. Specifically § 24.4.1-303 mandates that law enforcement agencies, prosecutorial agencies, judicial agencies and correction agencies shall ensure that victims of crimes are afforded rights. C.R.S. § 24-4.1-303(5) specifies *that all reasonable attempts shall be made to protect any victim or the victim's immediate family from harm, harassment, intimidation or retaliation* arising from cooperating in the reporting, investigation, and prosecution of a crime. From these and other stated rights there is no question that probation and state actors were obligated to afford protections and rights guaranteed under the statute. The Plaintiffs were intended beneficiaries of protection with a right to be warned, if the criminal Wellington contemplated harm to them, or threatened harm to them.

Aplt. Br. at 44. We are not persuaded. The victim-rights statute does not support any expansion of liability of mental-health providers. In the first place, the

-17-

statute imposes no duties on them.  Its purpose is "to assure that all victims of and witnesses to crimes are honored and protected *by law enforcement agencies, prosecutors, and judges*."  Colo. Rev. Stat. § 24-4.1-301 (emphasis added).  Dr. Jonsson is not a law-enforcement agent, prosecutor, or judge.  Likewise, § 24-4.1-303(1) states:  "Law enforcement agencies, prosecutorial agencies, judicial agencies, and correctional agencies shall ensure that victims of crimes are afforded the rights described in section 24-4.1-302.5."  Again, no duty is imposed on mental-health providers.

In addition, the statute does not impose liability for damages on anyone: The statute provides no damages remedy; and those on whom a duty is imposed cannot be sued for damages.  Judges, for example, are immune from suits for damages.  *See State v. Mason*, 724 P.2d 1289, 1290 (Colo. 1986).  And the Colorado Governmental Immunity Act protects the other officials who have duties under the statute.  *See* Colo. Rev. Stat. § 24-10-118(2)(a).  Accordingly, we see no reason to modify our interpretation of Section 117 based on the victim-rights statute.

> **2.    Did Wellington "Communicate" to Dr. Jonsson a Serious Threat of Imminent Physical Violence Against the Plaintiffs?**

The Plaintiffs argue that even if Section 117 applies, summary judgment was nevertheless inappropriate.  Under the statute, a mental-health professional "shall not be held civilly liable for failure to predict [a patient's] violent behavior,

*except where* the patient has communicated to the mental health care provider a serious threat of imminent physical violence against a specific person or persons." *Id.* § 13-21-117 (emphasis added). Upon receiving such a communication, the provider must "mak[e] reasonable and timely efforts to notify any person or persons specifically threatened, as well as notify[] an appropriate law enforcement agency or . . . tak[e] other appropriate action including, but not limited to, hospitalizing the patient." *Id.* The Plaintiffs contend that Wellington communicated a threat and that Dr. Jonsson is therefore liable because it is undisputed that she did not warn either the Plaintiffs or the probation department.

The Plaintiffs do not say that there is any evidence that Wellington told Dr. Jonsson that he intended imminent violence against them. They argue, however, that Dr. Jonsson nevertheless had a duty to warn them because any reasonable psychologist in her position would have known from Wellington's history that he posed a serious risk of violence to them. They assert that in determining whether a threat was made, Dr. Jonsson ought to have looked to Wellington's four-year history of stalking the Plaintiffs, his felony stalking conviction, his suicidal breakdowns, his past deviant sexual thoughts, and his probation violations; and they add that Dr. Jonsson should have taken into account the Columbine High School murder–suicides, and "other historical pertinent medical and socio-historical data." Aplt. Br. at 39.

We disagree with the standard articulated by the Plaintiffs. Section 117 requires that the threat be "communicated" to the mental-health provider. As commonly understood, to *communicate* means "to make known; inform a person of; convey the knowledge or information of." Webster's Third New International Dictionary 460 (2002). A person "communicates a threat" when he *expresses* the threat. The Plaintiffs would have us hold that Wellington "communicated to [Dr. Jonsson] a serious threat of imminent physical violence" so long as the information available to Dr. Jonsson (however she obtained it) would tell a reasonably prudent psychologist that Wellington posed such a threat. But this interpretation of *communicate* would contradict the statutory language that mental-health providers "shall not be . . . liable for failure to predict [a patient's] violent behavior." Colo. Rev. Stat. § 13-21-117. Under Plaintiffs' reading, the statute becomes internally inconsistent, stating that mental-health providers "shall not be held civilly liable for failure to predict [a patient's] violent behavior, [*except when they should be able to predict the violent behavior*]." We reject this nonsensical interpretation.

A much more reasonable interpretation of the statute is that the mental-health provider has a duty to warn only when the patient himself predicts his violent behavior (by communicating—that is, expressing—his threat to the mental-health provider).

*McCarty v. Kaiser Hill Co.*, 15 P.3d 1122 (Colo. Ct. App. 2000), on which the Plaintiffs rely, is not to the contrary. McCarty told his psychologist "about a problem he had had the previous day with his [work] supervisor, described his strong negative feelings about his supervisors, and expressed concern that he might not be able to control his anger." *Id.* at 1125. He said that he was "'feeling sort of homicidal,'" and, when discussing his supervisor, that "he knew martial arts and, if provoked, could kill someone." *Id.* He further stated that "they don't deserve to die, they do deserve to have their ass kicked." *Id.* (alterations and internal quotation marks omitted). The psychologist concluded that based on McCarty's comments to him, he had a duty under Section 117 to warn McCarty's supervisors. He warned them, and McCarty was fired. *See id.* at 1124.

McCarty sued his psychologist for professional negligence. *See id.* McCarty contended that the psychologist was not protected by Section 117 because he (McCarty) had never communicated a serious threat of imminent violence. The Colorado Court of Appeals disagreed, observing that McCarty's statements to the psychologist "were sufficient to demonstrate as a matter of law that the psychologist had a duty to warn [McCarty's] supervisors." *Id.* at 1125.

*McCarty* is readily distinguishable from this case because Wellington, unlike McCarty, did not *tell* his psychologist that he was dangerous. It is undisputed that Wellington never told Dr. Jonsson that he presently intended to

harm or threaten the Plaintiffs. He told her that he *used to* harbor violent fantasies involving the Plaintiffs, but that he no longer harbored such fantasies. Because the Plaintiffs have not pointed to any evidence that Wellington communicated to Dr. Jonsson "a serious threat of imminent physical violence against a specific person or persons," Colo. Rev. Stat. § 13-21-117, Dr. Jonsson is not subject to liability under Section 117 and summary judgment was appropriate.

## III.   CONCLUSION

We AFFIRM the grant of summary judgment. We GRANT Dr. Jonsson's October 7, 2009, motion to file a sur-reply regarding certification and DENY the Plaintiffs' motion to certify to the Colorado Supreme Court the issues of state law posed by this appeal.